# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DENNIS SMITH,

    *Plaintiff*,

v.                            CASE NO. 2:13–CV–14750–GCS–PTM

COMMISSIONER OF             DISTRICT JUDGE GEORGE CARAM STEEH
SOCIAL SECURITY,          MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

      In light of the entire record, I suggest substantial evidence supports the Commissioner's

determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that

Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary

Judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

      This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. §

636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Dennis Smith was twenty-seven years old at the time of the most recent administrative hearing on August 14, 2012. (Transcript, Doc. 6 at 34, 160.) Plaintiff worked full-time for two months in 2006 as a cook, full-time for one year as a fast food worker from 2006 to 2007, part-time for nine months as an independent contractor from 2009 to 2010, and full-time for nineteen months from 2007 to 2009 as a fast food worker. (Tr. at 202.) Plaintiff filed the present claims on August 30, 2010, alleging that he became unable to work on March 15, 2009. (Tr. at 160, 167.) The claims were denied at the initial administrative stages. (Tr. at 92, 93.) In denying Plaintiff's claims, the Commissioner considered anxiety related disorders and affective disorders. (*Id.*) On August 14, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Keith J. Kearney, who considered the application for benefits *de novo*. (Tr. at 34-67.) In a decision dated August 22, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 5-24.) On August 30, 2012, Plaintiff requested a review of this decision. (Tr. at 32-33.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 17, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On November 18, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

## B.    Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting

under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three stage review process. *Yuckert*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

## C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible

for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Disability Insurance Benefits ("DIB"), provided for in Title II, 42 U.S.C. §§ 401-434, are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Supplemental Security Income ("SSI"), provided for in Title XVI, 42 U.S.C. §§ 1381-1385, is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003), *cited with approval in Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). If the analysis reaches step five the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.    ALJ Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2012, and had not engaged in substantial gainful activity since March 15, 2009, the alleged onset date. (Tr. at 5-24.) At step two, the ALJ found that Plaintiff's conditions of posttraumatic stress disorder, depression, and social anxiety disorder were "severe" within the meaning of 20 C.F.R. § 404.1520. (Tr. at 11-12.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 12-13.) At step four,

the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 18.) The ALJ also found that Plaintiff was twenty-four years old at the alleged onset date, putting him into the "younger individual" range of 18-44 years. (Tr. at 19.) At step five, the ALJ found that Plaintiff could perform a full range of work at all exertional levels, but with several nonexertional limitations. (Tr. at 13.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 20.)

### E.      Administrative Record

### 1.      Medical History

The Transcript contains a record dated July 23, 2009 for cannabis and cocaine dependence outpatient treatment at Sacred Heart Rehabilitation Center; Plaintiff's treatment was to consist of sixteen visits, however there are no specific dates given for any of Plaintiff's actual visits. (Tr. at 270-74.) It appears he went to an assessment and, either never returned for any visits, or did not provide any records of any return visits. (*Id.*) The diagnostic impression was that Plaintiff was willing to participate in treatment, had family support, had insight into his problems, had good interpersonal skills, needed education about substance abuse, needed emotional-anger management skills, and needed relapse prevention information. (*Id.*) The clinic assessed him with mild to moderate posttraumatic stress disorder ("PTSD"). (*Id.*) His Axis IV assessments included education, occupational, economic, access to health care, and legal problems. (*Id.*) He was also assessed with a Global Assessment of Functioning ("GAF") score of fifty. (*Id.*) This record appears to be signed by a "Craig Ford," although there is no typed name, only a signature and unreadable credentials. (*Id.*)

Plaintiff was evaluated by licensed psychologist George Pestrue, Ph.D. on February 9, 2011. (Tr. at 262-69.) Plaintiff explained that Dr. Craig Ford[2] had diagnosed him with PTSD because his mother had not been there for him when he was growing up and his father had to fill both roles and sometimes physically abused him by beating him with a belt. (*Id.*) He explained that this background gave him serious abandonment issues and caused him to lash out and create hostile work environments. (*Id.*) He also explained that some days he would be "perfectly fine" and other days he would be "moody and depressed and . . . want to stay in bed all day." (*Id.*) He faced anxiety about going into public by himself, problems with ADD as a child, and learning difficulties. (*Id.*) Plaintiff's physical problems included right knee pain and high blood pressure. (*Id.*) At this time, Plaintiff was taking Zoloft and Remeron as prescribed by Dr. Usha Movva, MD. (*Id.*)

Dr. Pestrue surveyed Plaintiff's personal history at this assessment. (*Id.*) Plaintiff started but did not finish twelfth grade and took several special education classes. (*Id.*) He was in a very stressful marriage for six years and was currently living with his girlfriend and getting along with her "pretty well." (*Id.*) He had a history of abusing alcohol, marijuana, and cocaine. (*Id.*) At the time of the assessment he had completely quit using cocaine, had not used marijuana for over a month, and would drink a twelve pack of beer "maybe every two weeks." He also smoked about two packs of cigarettes and drank about three pots of coffee and two to three Pepsis a day. (*Id.*) His hobbies were spending time with his fiancé's children, playing video games, building models of cars, though he had not done so in four or five years, tinkering

---

[2] It appears that Plaintiff is referring to the person who assessed him at Sacred Heart Rehabilitation Center on July 23, 2009, although all that is available from that visit is a signed name that looks like it could be Craig Ford. *See* (Tr. at 274.) It is also difficult to make out this person's credentials. (*Id.*)

7

around the barn making crosses and "stuff like that," and watching four to six hours of television a day. (*Id.*) He said that he lived with his fiancé and her two kids and that he would do the laundry, vacuum, mop, do some cooking, and sometimes shop if his fiancé was with him and if the store was not busy. (*Id.*) He did not wash dishes. (*Id.*)

Plaintiff explained that his only real friend was his fiancé. (*Id.*) At the assessment Plaintiff "related to [Dr. Pestrue] in a friendly and cooperative manner." (*Id.*) His hygiene was good, his "facial expression was alert but moderately anxious and tense and mildly depressed," "[h]is speech in tone, pace and volume was appropriate," and his "articulation was clear." (*Id.*) Plaintiff "showed adequate contact with reality," poor self-esteem, and fair insight into his status. (*Id.*) "His general motivation for many of life's usual activities, including pleasurable activities, varie[d] considerably with his mood." (*Id.*) His "stream of mental activity was spontaneous," his "responses were reasonable and logical," and "[h]e was a good historian for personal information." (*Id.*) He had mostly flat affect throughout the evaluation. (*Id.*)

Plaintiff had never experienced hallucinations, delusions, or suicidal ideations, and no obsessive/compulsive behavior was noted. (*Id.*) Plaintiff usually went to bed around midnight and woke up a couple times during the night. (*Id.*) Sometimes he felt groggy when he woke up in the morning and sometimes he felt well rested. (*Id.*) Sometimes he would sleep for days on end and others he would go for several nights without sleeping. (*Id.*)

Plaintiff was oriented to his surroundings. (*Id.*) He was assessed with PTSD, major depression, social anxiety disorder, and ADHD; his Axis IV was severe; and his GAF score was forty-eight. (*Id.*) Dr. Pestrue also noted the following:

> [Plaintiff] may have some difficulty working in some manual labor jobs where he has to be on his feet for extended periods of time because of the injury to his right knee. On some

days his depression will leave him tired and lacking in motivation. His social anxieties will make it difficult for him to work in social situations. He has trouble focusing and concentrating and completing tasks. He claimed to have learning problems and may have difficulty working in any job requiring normal cognitive skills.

(*Id.*)

On February 7, 2011, Plaintiff underwent a psychiatric evaluation with Dr. Movva. (Tr. at 308-10.) He presented with symptoms of depression and anxiety and had "no motivation, loss of energy, no interest in doing things, and . . . [had been] staying in bed." (*Id.*) He was refusing to bathe, was self-isolating, and had problems expressing himself. (*Id.*) At this time Plaintiff did not appear in acute physical distress, his responses were appropriate, his affect was depressed, "[h]e denied suicidal or homicidal ideations, he was oriented times three, there was "no evidence of cognitive deficits," his judgment was fair, and his insight was present to some extent. (*Id.*) Plaintiff's Axis I diagnosis was "[m]ajor depression, recurrent without psychotic features[,] [r]ule out [PTSD, and h]istory of alcohol, marijuana, and cocaine dependence"; his Axis III was "[h]istory of hypertension and head injury"; his Axis IV was financial issues, interpersonal issues, and past abuse; and his Axis V GAF was forty-five. (*Id.*) Dr. Movva's treatment plan was to begin Zoloft, continue Remeron, continue his dependency treatment, and to have him return in one month. (*Id.*)

Plaintiff saw Dr. Movva again on March 3, 2011. (Tr. at 311.) He stated he had been sleeping well until the previous week. (*Id.*) His affect was reactive and mildly anxious. (*Id.*) He denied suicidal and homicidal ideations and there was no evidence of psychosis. (*Id.*) Dr. Movva increased his doses of Zoloft and Remeron. (*Id.*)

Plaintiff was evaluated by limited licensed psychologist Thomas L. Siebert, M.S. on April 6, 2011. (Tr. at 285-307.) He had been referred for a learning disability evaluation and a

clinical psychological study. (Tr. at 285.) At the time he was not participating in any psychotherapy, although intended to begin group therapy. (*Id.*) He reported that his poor concentration had caused him problems in school but "not in the work or social settings." (Tr. at 286.) He also reported that when he was growing up his father was physically and verbally abusive. (*Id.*)

Plaintiff had recently resumed taking the ADHD medicine that he had taken when he was eight to thirteen years old and it seemed to be helping. (Tr. at 286-87.) While his "responses . . . d[id] not strongly support a diagnostic impression of [ADHD,] because he had been prescribed medication and [was] find[ing] that medication to be helpful," Mr. Siebert found it probable that Plaintiff did have ADHD. (Tr. at 287.)

Plaintiff reported that he had been unemployed for ten months prior to this evaluation. (Tr. at 288.) He explained that in that period he had submitted forty to fifty job applications and had been to three or four interviews. (*Id.*) He thought his arrest record might be the reason that he had not been able to get a job. (*Id.*)

Mr. Siebert noted that Plaintiff "does not have any weeping spells," or current thoughts of suicide, although he was sometimes depressed because of his lack of employment and past mistakes. (Tr. at 289.) Plaintiff reported that when he was fifteen he attempted suicide by jumping off of a roof. (*Id.*) Plaintiff reported "sometimes avoid[ing] people," and having mood swings. (*Id.*) During manic spells, he would avoid sleep for three or for days and have "rapid thoughts." (*Id.*) He denied ever suffering a panic attack. (Tr. at 290.) He reported having nightmares of being physically abused by his father and denied any flashbacks to the abuse. (*Id.*) He had not had any nightmares for the last three years. (*Id.*)

10

Mr. Siebert's intellectual assessment was that Plaintiff was "functioning in the below-average to average range of intellectual ability as measured by his performance on the Wechsler Adult Intelligence Scale-IV" and his full-scale IQ score was in the borderline category. (Tr. at 291.) He had average reading, spelling, and math skills. (Tr. at 293.) Mr. Siebert explained that "[a]lthough [Plaintiff] generated IQ scores in the below-average to borderline range, all of his academic skills [were] in the average range. As a result, he d[id] not make a diagnostic impression of borderline intellectual functioning . . . ." (Tr. at 297.) Further, "[h]is IQ scores may have been repressed by his concentration challenges." (*Id.*) His Minnesota Multiphasic Personality Inventory-2 profile "reflect[ed] the fact that he ha[d] significant mood swings." (Tr. at 302.) There was a diagnostic impression of bipolar disorder and generalized anxiety disorder. (*Id.*) Because he had not had nightmares for more than three years there was no diagnostic impression of PTSD. (*Id.*)

Mr. Siebert noted that Plaintiff would have "difficulty working in any occupation that require[d] above-average powers of concentration and difficulty working in any occupation that ha[d] an above-average degree of stress." (Tr. at 304.) He indicated that Plaintiff would be a poor candidate for learning a skilled trade and a low-average candidate for college level study. (*Id.*) He noted that Plaintiff did not "present diagnostic symptoms sufficient . . . to justify a diagnostic impression of alcohol dependence or abuse." (Tr. at 306.)

On April 14, 2011 Plaintiff returned to Dr. Movva. (Tr. at 312-13.) He reported doing better but was having sleeping problems because he liked to stay up all night and so he was sleeping most of the day.  (*Id.*) He agreed to work with his fiancé to keep busy during the day so he would sleep at night. (*Id.*) The fact that his fiancé's brother was living with them was

11

causing him a lot of stress. (*Id.*) His affect was "pleasant and reactive," he "[d]enied thoughts of self-harm, harm to others," and there was no evidence of psychosis. (*Id.*)

He saw Dr. Movva again on May 5, 2011. (Tr. at 314-15.) He reported that the Zoloft was working well but because of sexual side-effects he had stopped taking it about a week before this visit. (*Id.*) Dr. Movva switched his medicine from Zoloft to Wellbutrin. (*Id.*) On July 7, 2011 Plaintiff's fiancé reported that he was doing much better and was looking for a job. (*Id.*) He was tolerating the Wellbutrin and was not having any side-effects. (*Id.*) "His affect [was] pleasant and reactive," there was "[n]o evidence of thoughts of self-harm, harm to others," or hallucinations. (*Id.*) On October 3, 2011, Plaintiff was "doing much better with Wellbutrin." (Tr. at 317.) He was sleeping better and had recently started a temporary night job. (*Id.*) On December 1, 2011, Plaintiff reported that right after his October 3 appointment he was fired from his job for "poor hygiene." (Tr. at 318.) After the firing his anxiety worsened to the point he was unable to sleep. (*Id.*) His affect at this appointment was "mildly anxious." (*Id.*) Dr. Movva increased the Remeron, maintained the Wellbutrin, and added BuSpar. (*Id.*)

On February 2, 2012, Plaintiff stated that the Vistaril he started taking after contacting the clinic complaining of sleeping issues had been working and he was now sleeping better. (Tr. at 350.) He reported that "things [had been] fine" until about a week ago when he was contacted about a child custody hearing taking place in Texas. (*Id.*) He was not attending group counseling because whenever he mentioned his marijuana use he got the feeling that the group was judging him. (*Id.*) His "affect [was] pleasant and reactive," he denied "suicidal or homicidal ideations," and he denied "auditory and visual hallucinations." (*Id.*) Plaintiff was late for his May 17, 2012 appointment. (Tr. at 351.) At this time, he reported that he was

working with Michigan Rehabilitation Services to get a job. (*Id.*) He denied having any side-effects from his medications. (*Id.*)

On May 24, 2012, Plaintiff was examined by a Dr. Kackler, D.O. at Michigan Rehabilitation Services. (Tr. at 319-22.) Dr. Kackler indicated that Plaintiff had no physical limitations; that Plaintiff could "frequently" sit, stand, walk, lift over fifty pounds, bend, squat, crawl, kneel, reach over shoulder, grasp on right side, grasp on left side, push, pull, climb stairs, and climb; and that depression might affect Plaintiff's ability to work and should be further evaluated. (*Id.*) He also indicated that Plaintiff had reduced intellectual and emotional resources and poor self-awareness. (*Id.*)

On July 16, 2012, Dr. Movva completed a Medical Source Statement (Mental) form for Plaintiff. (Tr. at 352.) This is a multiple-choice style form where a treating physician checks the level of various limitations the impairments cause. (*Id.*) For the diagnosis section, Dr. Movva indicated Plaintiff's impairment was "296.33 maj[or] dep[ressive] dis[order] sev[ere] rec[urrent] w[ith]o[ut] psy[chotic features]." (*Id.*) Dr. Movva indicated that Plaintiff was "not significantly limited or unknown" in his ability to (1) "understand, remember, and carry out simple one-or-two step job instructions" and (2) "to handle funds"; that he was "moderately limited" in his ability to (1) "relate and interact with supervisors and co-workers," (2) "deal with the public," (3) "maintain concentration and attention for at least two hour increments," and (4) "withstand stress and pressures associated with an eight-hour work day and day-to-day work activity"; and that he was "markedly limited" in his "ability to understand, remember, and carry out an extensive variety of technical and/or complex job instructions." (*Id.*) Dr.

13

Movva left blank the prompt to "indicate any other work-related limitations, including those resulting from prescribed medications." (*Id.*)

### 2.     Function Reports and Testimony at Administrative Hearing

In his adult function report, Plaintiff states that he has "moderate to sever[e] mood swings" and that his knees are "so painful [he] can[not] walk and every now and then one of them may go out and [he] fall[s]." (Tr. at 208-19.) He said that he cared for his fiancé's children, cooked meals and did laundry. (*Id.*) He also cared for pets by feeding and walking them. (*Id.*) Knee pain and anxiety sometimes affected Plaintiff's sleep. (*Id.*) He reported no problem with personal care. (*Id.*) He needed special reminders to get back on task, but did not need reminders to take medicine. (*Id.*) He made his own meals, maybe weekly, and it took him between ten minutes and three hours. (*Id.*) He was able to do laundry, mop, sweep, pick up the house, and pick up the yard. (*Id.*) He went outside every couple of days, he traveled by driving a car; he did not go out alone because he would "get very nervous and anxious like everyone [was] watching [him]," and because he felt like he was going to "screw up." (*Id.*)

He reported that he could pay bills and count change but that he could not handle a savings account or use checkbooks/money orders. (*Id.*) His hobbies were "playing games, sports, spending time with" his fiancé, and watching television. (*Id.*) He said that he spent time with others–but he only specifically identified spending time with his fiancé and her kids–and chatting online, and talking to family. (*Id.*) He stated that sometimes he had problems "getting along with family, friends, neighbors," and others because he would become "very irritated" and upset that he did not "fit in." (*Id.*)

He contended that his condition affected lifting, standing, walking, stair climbing, memory, completing tasks, concentration, understanding, and getting along with others. (*Id.*) He explained that "it is hard on my knees sometimes when walk[ing] a mile or two and when lift[ing] a lot." (*Id.*) Also he could not "always remember or understand things." (*Id.*) He reported he could walk a mile or two before resting and that he could resume walking after a twenty minute rest. (*Id.*) He could pay attention for twenty to thirty minutes if he gave his full attention, he could "somewhat" follow written instructions, and sometimes it was hard to remember spoken instructions. (*Id.*) He said he did not get along well with authority figures, and did not handle stress well. (*Id.*) He reported using a brace when "playing sports or walking and running a lot," but did not remember when it was prescribed. (*Id.*)

Plaintiff's fiancé, Kimberly S. Ouillette, completed a third-party function report. (Tr. at 220-31.) She reported that Plaintiff got very irritable and upset and slept a lot because he was "bipolar." (*Id.*) She said his daily activities included getting up, getting kids off to school, "sometimes tak[ing] a nap," letting the animals out and feeding them, making coffee, taking a shower, cleaning, watching television, walking the dogs, helping with dinner, and going back to bed. (*Id.*) Plaintiff also sometimes helped care for his fiancé; for example, he reminded her to take her medication. (*Id.*) She reported that his condition affected his sleep because he sometimes did not get enough sleep. (*Id.*) He needed reminders to take showers, put deodorant on, and brush his teeth. (*Id.*) She confirmed that he grew anxious when he went out alone. (*Id.*) She explained that he had problems getting along with people because he easily became irritated, defensive, and mad, and he always felt the need to get his point across. (*Id.*) She also said that he did not go out much because he did not trust people. (*Id.*) She claimed that his condition affected his ability to lift, stand, walk, climb stairs, remember, complete tasks,

15

concentrate, and get along with others. (*Id.*) "He can only lift so much due to his knee and his knee hurts if he walks to[o] much, [h]is depression and anxiety make it hard for him to complete tasks and concentrate and get along with people." (*Id.*) She reported that his brace was prescribed in 2003 and he used it when he walked excessively. (*Id.*)

At the administrative hearing, Plaintiff testified that his major depression and PTSD prevented him from working. (Tr. at 40.) He said that his depression was always present, and that about three times a month it would get so bad that he would isolate himself, sleep nonstop, and not eat. (Tr. at 40-41.) He had trouble sleeping at night, sometimes getting as little as four hours of sleep and sometimes sleeping all of the time. (Tr. at 41.) His anxiety prevented him from participating in social activities and going to places with crowds. (*Id.*) He explained that stress aggravated his depression. (*Id.*) At the times when he isolated himself he also lacked motivation to do housework, such as dishes, dusting, sweeping, and vacuuming. (Tr. at 42.) He explained that in addition to stress, nightmares caused problems with sleeping. (*Id.*) The nightmares consisted of flashbacks to his childhood. (*Id.*) He also struggled with panic attacks from time to time. (*Id.*) He testified that the frequency of the panic attacks was "at least once daily," with a duration of between fifteen and twenty minutes. (*Id.*)

He testified that he had worked at Acosta, in retail merchandising, "setting up displays and shelves for grocery stores," from November 2011 to December 2011, and that he was fired because he "had bad body odor." (Tr. at 46-47.) He believed that aside from the body odor issue his employers had been happy with his work. (*Id.*)

He was seeing Dr. Movva about every two months and he planned on beginning group therapy "next month." (Tr. at 50.) He was taking Wellbutrin "here and there, but not regularly" for his depression. (*Id.*) He was also taking BuSpar three times a day for his anxiety and panic

16

attacks. (Tr. at 53-54.) If he were to travel and forget his medication he would become very anxious, that is, his breathing would become heavy, he would worry that he would not be able to function, and then "basically [he would] shut down." (Tr. at 54.) He explained that the last time this happened he cried for about six hours. (*Id.*) He also took Remeron and Vistaril to help him sleep. (Tr. at 55-56.) Finally, he took Klonopin, which also was to help him sleep, and to help with nightmares. (*Id.*) He got his medicine for free. (Tr. at 56.) He testified that he was off of cocaine and marijuana. (Tr. at 57-58.) He stated that his knee "[was] not a major problem," and otherwise than he was physically fine. (Tr. at 58.)

### 3.     Vocational Expert Testimony at Administrative Hearing

The ALJ asked the VE to "assume a hypothetical individual of [Plaintiff's] age and education" and work experience who was

> limited to essentially no physical limitations, with the occasional limitation of the person would . . . be in need of assistance if he needed to use a right foot control, and would only occasionally be able to kneel. The individual would also be limited to simple tasks, . . . they would be limited to routine and repetitive tasks. Interaction with supervisors would be occasional, interaction with co-workers would be occasional, interaction with the public would be never.

(Tr. at 62.) The VE testified that the hypothetical individual would not be able to perform Plaintiff's past work. (Tr. at 62-63.) However, other work would be available: for example, kitchen helper (approximately 8500 jobs in Michigan and 282,000 nationally), equipment cleaner (approximately 6500 in Michigan and 196,000 nationally), and inspector work (approximately 5800 jobs in Michigan and 129,000 nationally). (*Id.*) The VE testified that these numbers were consistent with the Dictionary of Occupational Titles. (*Id.*)

The ALJ then asked the VE to consider another hypothetical individual with the same limitations as the first but also with a further limitation that,

17

they [sic] would never be able to receive complex written or verbal communication. . . . [T]he work would be limited to one[-] or two-step tasks. The individual would be able to understand, remember, and carry out simple instructions. The individual would work in a low-stress job, defined as having no decision[-]making responsibilities, occasional changes in the work setting. The individual would also have to make no judgment calls. The work would [not] . . . have production range or fast-paced production, but rather would be goal-oriented.[3] There would be no or limited assembly line work.

(Tr. at 63-64.) The VE testified that the second hypothetical individual could still work as a kitchen helper and equipment cleaner, however would not be able to work as an inspector because of the judgment calls needed. (Tr. at 64.) He could also be a laundry worker (approximately 2500 in Michigan and 86,000 nationally). (*Id.*)

The ALJ constructed a third hypothetical in which "the individual would have the same restrictions as in the first two," with the additional limitation "being that the individual would . . . be limited in proximity to others to minimize distraction." (Tr. at 64-65.) The VE testified that because the  kitchen helper, equipment cleaner, and laundry worker jobs did not require a lot of communication with others, but allowed a worker to work individually, the third hypothetical individual would still be able to work those jobs. (Tr. at 65.)

The ALJ constructed a fourth hypothetical where the individual "would be unable to engage in a sustained work activity for a full eight-hour day on a regular basis." The VE stated that this would be work preclusive. (*Id.*) The VE testified that a person could only be off task twenty percent of the time and absent only one day per month before it would be work preclusive. (Tr. at 65-66.)

## F.     Governing Law and Analysis

---

[3] The transcript does not include the word "not." This is probably a mistake in transcription. In any case, the sentence does not make sense without the word "not," and the VE clearly construed it as a limitation on production range/fast-paced work.

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

### 1.      Legal Standard

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the RFC to perform a full range of work at all exertional levels with nonexertional limitations. (Tr. at 13.) The ALJ also added a limitation that Plaintiff could only occasionally kneel and would occasionally need assistance in operating right foot controls. (*Id.*)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*,

167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.   Medically-Determinable Impairments, Treating Sources, and Credibility Assessments

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s),

20

and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When

"acceptable medical sources" issue these opinions, the regulations deem the statements to be

"medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527.

Excluded from the definition of "medical opinions" are various decisions reserved to the

Commissioner, such as whether the claimant meets the statutory definition of disability and

how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of

medical opinions from acceptable sources, including treating source opinions that have not

been given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should use the same

analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL

2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and

severity of a claimant's impairments controlling weight when they are "well-supported by

medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent

with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-

2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to

the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R.

§ 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is

the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based

solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067

(N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations

also require an ALJ to provide "good reasons" for the weight assigned to the treating source's

opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The regulations establish the following process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ evaluates symptoms by confirming, with medical signs and laboratory findings, that a medical impairment exists which "could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 404.1529. The ALJ then determines whether that condition could reasonably be expected to produce the alleged symptoms or whether other objective evidence verifies the symptoms. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ determines the extent of work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

22

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3.

The claimant's work history and the consistency of subjective statements are also relevant. 20

C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of

witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at

542 (noting that the "ALJ's credibility determinations about the claimant are to be given great

weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is

appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,

and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a

claimant's subjective complaints and may . . . consider the credibility of a claimant when

making a determination of disability."). "However, the ALJ is not free to make credibility

determinations based solely upon an 'intangible or intuitive notion about an individual's

credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).


### b.    Substantial Evidence Analysis

Plaintiff contends that, "Because each element of the hypothetical does not accurately

describe Mr. Smith in all significant, relevant respects, the VE's testimony at the hearing

should not constitute substantial evidence. The ALJ did not properly evaluate Mr. Smith's

impairments in the hypothetical question, and therefore, the hypothetical is flawed." (Doc. 9 at

9.)

Plaintiff attempts to support this contention with analysis-free, inapplicable block quotations to social security law. First comes a reference to the regulations regarding the weight the ALJ must give to treating source opinions. (*Id.* at 9 (quoting 20 C.F.R. § 404.1527 (d)(2)).) Following this, Plaintiff cites the Social Security Ruling that lists the required elements of an RFC when symptoms, such as pain, are alleged. (Doc. 9 at 9 (quoting SSR 96-8p, 1996 WL 374184, at *7).) Next comes a misquotation of the regulations: "[]findings of the treating physician as of the severity of an impairment be accorded controlling weight if they are [']well-supported by medically accepted clinical and laboratory diagnostic techniques and['] are [']not inconsistent with the other substantial evidence['] in the record.'"[4] (Doc. 9 at 10 (quoting 20 C.F.R. § 404.1527(d)(2)).)

Unfortunately Plaintiff's counsel does not follow this patchwork of social security law with analysis of how it applies to Plaintiff's case, but instead reiterates Plaintiff's diagnoses and alleged symptoms and asserts that a finding of not disabled is "inhumane." (Doc 9 at 11.)

Plaintiff's counsel not only fails to point to any medically-determinable impairments of record that were not included in the RFC, but actually manufactures an exertional medical impairment that is not supported by the record. Plaintiff states that,

> Finding that Mr. Smith was capable of performing the positions of a kitchen helper, equipment cleaner, and laundry worker while he continuously requires the need to sit and stand, is not substantiated. To subject Mr. Smith to perform these positions further subjects him to more psychological pain and suffering because he would be put in a new environment with interaction with the public. Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified, it's inhumane.

---

[4] Plaintiff's quotation marks have been omitted because this is not a direct quotation of the regulation.

(Doc. 9 at 11.) However, there is no record of any sit/stand limitation from any medical source. And, considering Plaintiff's impairments are non-exertional, a sit/stand limitation does not make sense. Plaintiff also asserts that the ALJ requires Plaintiff to work with the public. But the ALJ specifically stated in his hypothetical question to the VE and in the RFC that "[t]he claimant can have no interaction with the public." (Tr. at 13; *accord* Tr. at 62.)

Plaintiff also asserts that "the reasoning to support his lack of credibility is not substantiated . . . [and that] since the ALJ gave no reasoning or justification to the finding that Mr. Smith was not credible . . . Mr. Smith was under a disability." (Doc. 9 at 11-12.) However, the record clearly demonstrates that the ALJ gave several reasons for his credibility assessment. He noted that Plaintiff has not received the type of medical treatment that a totally disabled person would typically seek. (Tr. at 15.) He cites Plaintiff's infrequent medical appointments, the significant gaps in treatment, the fact that he was only seeing a psychiatrist every other month and still was not in counseling, and that his medication had been relatively effective in controlling his symptoms. (*Id.*) The ALJ also looks to inconsistencies in the record. (*Id.*) He notes that the fact that Plaintiff had a job, while not rising to the level of substantial gainful employment, was an indication that his daily activities "ha[d] been somewhat greater than the claimant ha[d] generally reported." (*Id.*) He also noted that Plaintiff had been looking for jobs and interviewing, suggesting that he "believe[d] he [wa]s capable of performing some types of work." (Tr. at 15-16.) The ALJ noted that Plaintiff's activities of daily living were "not limited to the extent one would expect given his allegations of disabling symptoms." (Tr. at 16.) The ALJ therefore found Plaintiff's "statements concerning the intensity , persistence, and limiting effects of his alleged symptoms [were] not fully credible." (*Id.*)

25

Plaintiff does not construct any argument regarding the weight given to treating sources, he simply misquotes the relevant regulation. (Doc. 9 at 10 (quoting 20 C.F.R. § 404.1527(d)(2)).) In spite of Plaintiff's failure to preserve this argument, I suggest that substantial evidence supported the weight that the ALJ gave to all the medical opinions.

The ALJ assigned great weight to Dr. Kackler's opinion that Plaintiff "had no significant physical limitations . . . [and] "could frequently sit, stand, walk, and lift over fifty pounds, . . . because it [was] consistent with the medical evidence and the record as a whole, including the claimant's hearing testimony and reported activities of daily living." (Tr. at 16, 58, 319-22.) This is consistent with the record: Plaintiff stated at his hearing that his knee was "not a major problem." (Tr. at 58.) Further, he listed "playing sports" among his hobbies, he was able to walk a few miles before needing a break, and he said he was terminated for body odor and not because of any physical limitations. (Tr. at 46-47, 208-19.)

The ALJ gave partial weight to the July 16, 2012 Medical Source Statement (Mental) form in which Dr. Movva indicated that Plaintiff was "not significantly limited or unknown" in his ability to "understand, remember, and carry out simple one-or-two step job instructions." (Tr. at 16-17, 352.) He explained that while her opinion was "not necessarily inconsistent with the assessed RFC," it was on a form that phrased the "work-related limitations in rather vague terms." (Tr. at 16-17.) The ALJ also gave partial weight to Mr. Siebert's opinion "that the claimant would have difficulty working in any occupation that require[d] above-average powers of concentration or involve[d] an above-average degree of stress." (Tr. at 17); *see also* (Tr. at 285-307). According to the ALJ, Mr. Siebert was not an acceptable medical source, his opinion was vague, and it did "not describe specific work-related limitations." (*Id.*) The ALJ also gave partial weight to Dr. Pestrue's opinion that Plaintiff "had difficulty concentrating,

focusing, and completing tasks," because it was vague, was formulated after one examination, and was heavily reliant on Plaintiff's subjective report of his symptoms. (*Id.*); *see also* (Tr. at 262-69.) Because Dr. Pestrue's area of expertise was in psychology, the ALJ gave no weight to opinions about Plaintiff's knee pain. (Tr. at 17.) All these conclusions are well-reasoned.

### G.   Conclusion

For these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 5, 2014                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

28